UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case Number:

CRUISE PARTNERS, LLC,
a Pennsylvania limited liability company,

        Plaintiff,

   v.

ROYAL CARIBBEAN CRUISES LTD.,
A LIBERIAN CORPORATION,
a foreign corporation,

        Defendant.

_____/

## **COMPLAINT**

Plaintiff CRUISE PARTNERS LLC, a Pennsylvania limited liability company, through the undersigned counsel, sues Defendant ROYAL CARIBBEAN CRUISES LTD., A LIBERIAN CORPORATION, a foreign corporation, and states as follows:

### **PARTIES, JURISDICTION, AND VENUE**

1.    This is an action seeking damages in excess of $75,000.00 exclusive of interest, costs, and attorneys' fees.

2.    Plaintiff is a limited liability company organized under the laws of the Commonwealth of Pennsylvania.

3.    Defendant is a foreign corporation organized under the laws of Liberia, registered with the Florida Secretary of State and authorized to do business in the State of Florida, with its principal shoreside place of business in Miami, Florida.

4.    This Court has jurisdiction pursuant to 28 U.S.C. §1332(a)(2).

1

5.      Venue in this District is proper in that Defendant resides and conducts business in this District, a substantial part of the events giving rise to this action occurred in this District, and the parties have agreed contractually to this District as the sole forum for litigation between them. 28 U.S.C. §1391(b)(1)-(2).

## FACTUAL BACKGROUND

6.      Plaintiff is engaged in the business of planning and selling cruise ship vacations for its clients.

7.      Defendant is a cruise line which operates cruise ships for passengers around the world.

8.      On or about April 19, 2018, Plaintiff and Defendant entered into a "Guest Accommodations Purchase and Resale Agreement," (the "Agreement"). A true copy of the Agreement is attached hereto and incorporated herein as **Exhibit A.**

9.      Pursuant to the Agreement, Plaintiff would purchase the entirety of guest accommodations on Defendant's Enchantment of the Seas cruise ship, set to sail from Port Canaveral, Florida on March 4, 2019.

10.      The Agreement set forth the parties' financial arrangement:

> (a)      Plaintiff would buy all available public cabins on the cruise for $1,068,065.92, plus a set fee for prepaid gratuities, and re-sell these berths to its customers.

> (b)      The parties agreed to a "guaranteed onboard revenue amount" totaling $473,518.88.

> (c)      "Onboard revenues" are defined in the Agreement as revenues received by Defendant for onboard purchases during the cruise, including items such as casino proceeds, beverage sales, onboard gift shops, and spa/luxury services.

> (d)      If net onboard revenues fell short of the guaranteed onboard revenue amount, then Plaintiff was responsible to pay to Defendant the amount of

2

the shortfall. But if the net onboard revenues exceeded the guarantee, Plaintiff would receive a rebate of 50% of the overage (capped at 50% of the purchase price), to be credited against the overall purchase price.

11.     Thus, the general structure of the Agreement is clear. Defendant profits via the purchase price paid by Plaintiff to "buy out" the cruise ship, and by receiving 50% of the net onboard revenues generated during the cruise. Plaintiff profits via the re-sale of the cabins, and by receiving 50% of the net onboard revenues generated during the cruise, in excess of the guaranteed minimum.

12.     Plaintiff was entitled to the rebate as long as the guaranteed onboard revenue minimum was met, and "provided [Plaintiff] is not at any time in Default" under the Agreement's terms.

13.     In late 2018, Plaintiff came to recognize that despite its best efforts, it would be unable to sell all of the cabins available on the cruise.

14.     As it was in both parties' financial interests to ensure a full cruise ship, Plaintiff and Defendant agreed that Defendant would "take back" and market for sale the unsold accommodations.

15.     The parties memorialized this agreement in the "Amendment No. 1" to the original Agreement, effective January 17, 2019 (the "Amendment"). A true copy of the Amendment is attached hereto and incorporated herein as **Exhibit B**.

16.     Per the terms of the Amendment, the remainder of the Agreement, including its "rebate" provisions tied to onboard revenues, expressly was to remain in effect.

17.     To that end, the Amendment makes specific reference to the parties' continued obligations related to net onboard revenues "pursuant to the process set forth in the Agreement."

18.     The Amendment makes no reference to Plaintiff being in default under the Agreement, and in fact no notice of default ever was delivered to Plaintiff by Defendant.

19.     Plaintiff released the unsold cabins to Defendant, which marketed and sold them to cruise passengers.

20.     The cruise proceeded without incident.

21.     In the days following the cruise, Plaintiff began the process of inquiring as to the net onboard revenues generated during the cruise.

22.     Despite the express procedures set forth in the Agreement and confirmed by the Amendment, Defendant refused to discuss these revenue figures with Plaintiff, claiming it was "confidential information."

23.     When expressly asked for an accounting of onboard revenues by Plaintiff's principal, a certified public accountant, Defendant again refused, stating verbally and in writing that despite the express terms of the Agreement and the Amendment, the Amendment was merely Defendant's way to "salvage the voyage," and so Defendant did not owe Plaintiff an accounting of onboard revenues, let alone a rebate for such revenues.

24.     Though Plaintiff continued to pursue the matter, Defendant's representatives, including legal counsel, advised that the matter was "closed and final," that there was nothing further to discuss, and eventually refused to communicate at all with Plaintiff.

25.     Defendant's reading of the Amendment turns the Agreement into a "heads-I-win, tails-you-lose" contract whereby Plaintiff remained responsible for payment of any potential revenue shortfall vis-à-vis the onboard revenue guarantee, but was shut out of the agreed-upon sharing of onboard revenues exceeding the guarantee.

26.     Defendant stated in writing that it was adopting this position because "[w]e could have easily exercised our legal rights to declare [Plaintiff] in default" of the Agreement.

27.     As evidenced by this admission, Defendant did not declare Plaintiff in default of the Agreement, the full scope of which—including the rebate / onboard revenue-sharing provisions—remained in force after execution of the Amendment.

## COUNT I—Breach of Contract

28.     Plaintiff re-alleges paragraphs 1 through 27 as if fully set forth herein.

29.     Plaintiff and Defendant entered into a binding, written contract via the Agreement, as amended by the Amendment.

30.     Defendant's refusal to provide Plaintiff financial information related to net onboard revenues constitutes a material breach of the Agreement, as amended by the Amendment.

31.     Defendant's refusal to share in the net onboard revenue overage constitutes a material breach of the Agreement, as amended by the Amendment.

32.     Plaintiff has been damaged by Defendant's material breach, in that Plaintiff has not been availed of the purchase price rebate to which it is contractually entitled.

33.     On information and belief, based on knowledge of the subject cruise and the cruise industry, the rebate to which Plaintiff is contractually entitled is likely to total several hundred thousand dollars.

34.     Plaintiff fulfilled all of its contractual obligations under the Agreement, as amended by the Amendment, and at no time did Defendant notice Plaintiff that Plaintiff was in default of the Agreement as amended.

35.     All conditions precedent to bringing this action have been satisfied, waived, or rendered futile by the conduct of Defendant.

36.     Plaintiff has retained the undersigned counsel and has agreed to pay a reasonable attorneys' fee for counsel's services.

37.     Upon obtaining a judgment in its favor, and against Defendant, Plaintiff will be entitled to an award of attorneys' fees from Defendant pursuant to Section 25.2 of the Agreement.

WHEREFORE, Plaintiff respectfully requests this Court grant the following relief:

(a)     Judgment that Defendant's actions constitute a breach of contract;

(b)     An award of damages in excess of $75,000.00, exclusive of interest, costs, and attorney's fees, occasioned by Defendant's breach;

(c)     An award of reasonable attorneys' fees pursuant to Section 25.2 of the Agreement; and

(d)     An award of interest, costs, and such other relief as this Court deems just.

DATED:     February 21, 2021.

Respectfully submitted,

**s/ Nicholas M. Gieseler**
NICHOLAS M. GIESELER
Florida Bar No. 0043979

GIESELER & GIESELER P.A.
789 South Fed. Hwy, Suite 301
Stuart, Florida 34994
Phone:  (888) 202-2402
Fax:    (888) 757-6820
nmg@gieselerlaw.com

Counsel for Plaintiff

**EXHIBIT A**

Royal Caribbean Resale: Ver. 2017.10

# ROYAL CARIBBEAN INTERNATIONAL GUEST ACCOMMODATIONS PURCHASE AND RESALE AGREEMENT

**Issue Date:**          **April 19, 2018**

**Purchaser:**          **Cruise Partners LLC.**

**Vessel:**          **Enchantment of the Seas**

**Sail Date:**          **March 4, 2019**

**LENGTH OF CRUISE:**          **4 NIGHTS**

**ROYAL CARIBBEAN CRUISES LTD.,** a Liberian corporation d/b/a Royal Caribbean International with its principal shore side place of business at 1050 Caribbean Way, Miami, FL 33132 ("Cruise Line") and **CRUISE PARTNERS LLC. ,** a  limited liability company organized under the laws of the state of Pennsylvania and  having its principal place of business at **317 Davis Street, Clarks Summit, PA 18411** ("Purchaser") hereby enter into this Guest Accommodations Purchase and Resale Agreement (the "Agreement"), effective as of **February 22, 2018** (the "Effective Date") for the purchase of guest accommodations on the specific sailing described herein subject to the terms and conditions set forth in this Agreement.  Cruise Line and Purchaser collectively may be referred to in this Agreement as the "Parties."

## RECITALS

**WHEREAS**, the Parties are mutually desirous that Cruise Line sell to Purchaser and that Purchaser purchase from Cruise Line all of the guest accommodations on board the **Enchantment of the Seas** (the "Vessel") for the Cruise (as defined below) consistent with the terms and conditions of this Agreement.

**NOW, THEREFORE**, FOR GOOD AND VALUABLE CONSIDERATION, THE RECEIPT AND SUFFICIENCY OF WHICH ARE HEREBY ACKNOWLEDGED, PURCHASER AND CRUISE LINE HEREBY AGREE AS FOLLOWS:

MUST BE STAMPED BY RCL LEGAL AND SIGNED BY A SVP OF RCL TO BE BINDING
PROPRIETARY AND CONFIDENTIAL

| PURCHASER | |
|---|---|
| Please Initial | *[initials]* |

1

Royal Caribbean Resale: Ver. 2017.10

## ARTICLE 1.      ACCOMMODATIONS.

### Section 1.1.    *Cruise.*

Cruise Line shall reserve for Purchaser the total guest accommodations of the Vessel up to the Maximum Available Guest Berths set forth in Section 1.2 for a cruise commencing on the Sail Date set forth above on the itinerary set out in Section 2.1 below (the "Cruise").

### Section 1.2.    *Staterooms.*

The Vessel has the following Guest accommodations:

| Description | # of Staterooms Per Category | Quantity |
|---|---|---|
| **Total Guest Staterooms** | 1,142 | 2,284 |
| **Suites/Deluxe Staterooms Held by Cruise Line** | JS | 1 |
| **Balcony Staterooms Held by Cruise Line** | | |
| **Ocean View Staterooms Held by Cruise Line** | | |
| **Interior Staterooms Held by Cruise Line** | Q | 9 |
| **Maximum Available Guest Staterooms** | 1,132 | 2,260 |
| **"Total # of Available Double Occupancy Berths"** | 1,132 | 2,260 |
| **"Total # of Available Triple & Quad Guests Berths"** | | 666 |
| **Maximum Available Guest Berths** | | 2,626 |

As referenced above, ten (10) double occupancy guest staterooms (each a "Staff Room") shall be held by Cruise Line for use by entertainers, for use by Cruise Line staff onboard entitled to live in guest staterooms, for use by Cruise Line's shore side staff required to successfully deliver customized programming for the Cruise and as needed for other operations related functions.

## ARTICLE 2.      ITINERARY.

### Section 2.1.    *Schedule.*

Subject to port confirmation and the terms and conditions of this Agreement, including but not limited to Section 2.3 below, Purchaser's itinerary for the Cruise is as follows (all times being local time):

MUST BE STAMPED BY RCL LEGAL AND SIGNED BY A SVP OF RCL TO BE BINDING
PROPRIETARY AND CONFIDENTIAL

| PURCHASER | |
|---|---|
| **Please Initial** | |

2

Royal Caribbean Resale: Ver. 2017.10

| Day | Date | Port of Call | Arrival | Departure |
|-----|------|--------------|---------|-----------|
| MON | 3/4/2019 | Port Canaveral, Florida | | 4:00 PM |
| TUE | 3/5/2019 | Cococay, Bahamas | 8:00 AM | 5:30 PM |
| WED | 3/6/2019 | Nassau, Bahamas | 8:00 AM | 9:00 PM |
| THU | 3/7/2019 | Cruising | | |
| FRI | 3/8/2019 | Port Canaveral, Florida | 7:00 AM | |

**Section 2.2.** *Embarkation.*

Embarkation on the Sail Date is scheduled to begin at approximately 10:30 AM and debarkation from the Vessel at the conclusion of the Cruise is scheduled to begin at approximately 8:00 AM. All times are subject to final clearance of the Vessel by the applicable country's customs and immigration authorities.

**Section 2.3.** *Changes.*

The CruiseFare (as defined below in Section 3.1) is based on the itinerary for the Cruise listed in Section 2.1 above and provides for one departure from and one return to the Vessel's scheduled berth according to the itinerary herein. It is understood that departure and arrival times for the Cruise are not guaranteed and that any part of the itinerary is subject to delay, and to port of call cancellation occasioned by weather conditions, exigencies of safe navigation, navigation through regulated waters, ports and channels and other causes beyond the control of Cruise Line or as specified in the Resale Ticket Contract, as that term is defined in Section 12.3 below. The foregoing notwithstanding, Cruise Line will use reasonable efforts to cause a substitute of port of call or make itinerary changes, attempting to make either or both as nearly equitable as practicable, to the same benefit or advantage to the Guests and Purchaser as the original itinerary. In addition, Cruise Line reserves the right to change the deployment of the Vessel for any reason up until 12 months prior to departure. If the deployment change means the Vessel will not be available for the Cruise, then Cruise Line may, but is not required, offer a substitute vessel. If no substitute vessel is offered or Purchaser rejects the substitute vessel (except for a substitute vessel of the same class as provided in Section ____ below), then either Party may terminate this Agreement and Cruise Line's sole liability shall be to refund any payments made to Cruise Line by Purchaser as well as any Security Deposit, if applicable.

Subject to Port Confirmation, Cruise Line's Marine Operations department's approval and Cruise Line's Port Planning department's approval, Cruise Line will seek to honor any requested changes by Purchaser to the itinerary set forth in Section 2.1 for the Cruise. The final itinerary for the Cruise established pursuant to Section 2.1 and any additional charges for services incurred in connection with making such itinerary changes will be due and payable to Cruise Line at the time of making such change. Purchaser acknowledges that any request for an itinerary change made less than 270 days prior to the Sail Date will likely be impossible to effectuate because of port availability and other marine planning issues.

## ARTICLE 3.    CRUISEFARE AND ONBOARD REVENUE.

**Section 3.1.** *CruiseFare.*

Purchaser shall pay to Cruise Line for the Cruise the amounts defined in Subsection 3.1.1 and Subsection 3.1.2 below (collectively, the "CruiseFare"):

MUST BE STAMPED BY RCL LEGAL AND SIGNED BY A SVP OF RCL TO BE BINDING
PROPRIETARY AND CONFIDENTIAL

PURCHASER
Please Initial

3

Subsection 3.1.1       *Guaranteed Accommodation Amount.*

(Guaranteed Payment for the Total # of Available Double Occupancy Berths)

Payment in full of the following amount (the "Guaranteed Accommodation Amount") shall represent payment for the cruise fares due for the Total # of Available Double Occupancy Berths:

**$1,068,065.92** USD.

If the number of Guests who actually sail on the Cruise is less than the Total # of Available Double Occupancy Berths, there shall be no reduction in the Guaranteed Accommodation Amount due under this Subsection 3.1.1 and the full amount stipulated above shall remain due from Purchaser.

Subsection 3.1.2       *Third and Fourth Berth Guests.*

(Amounts Due for Each Berth in Excess of the Total # of Available Double Occupancy Berths)

For each Guest in excess of the number of Total # of Available Double Occupancy Berths on the Vessel, the Cruise Line shall be paid:

**$0.00 USD** per person.

The amounts due under this Subsection 3.1.2 may be referred to as the "3rd & 4th CruiseFare Amounts."

Subsection 3.1.3       *CruiseFare Rebate.*

Provided the Purchaser is not at any time in Default (as defined in Section 10.1 below) under this Agreement (whether before, during or after the Cruise), Cruise Line will provide a rebate of a portion of the Cruise Fare subject to the terms and conditions of this Subsection 3.1.3.

1. The determination of whether any rebate is due to Purchaser under this Subsection 3.1.3 shall be made within twenty (20) days after the end of the Cruise.

• Notwithstanding anything to the contrary in this Agreement, the amount of that rebate shall not exceed fifty (50%) percent of the CruiseFare actually paid to Cruise Line.

• The formula for calculating the amount of the rebate shall be as follows: [Actual Net Onboard Revenue minus the Guaranteed Onboard Revenue Amount but only if the resulting difference is a positive number] multiplied by fifty(50%) percent. That difference shall also be subject to the limitation set forth in the preceding paragraph. By way of example, if the Actual Net Onboard Revenue was 768,360 and the Guaranteed Onboard Revenue Amount was $668,360, the rebate to the Purchaser would be $50,000 [(768,360 – 668,360) * 50%.]

2. No rebate shall be due if the Purchaser is at any time in Default under this Agreement.

3. Cruise Line may setoff against the amount of the rebate, any amounts otherwise due from Purchaser to Cruise Line under this Agreement or any other agreement between or among Cruise Line (or its affiliates) and Purchaser (or its affiliates.).

**Section 3.2.**   *Guaranteed Onboard Revenue Amount.*

Subsection 3.2.1       *Onboard Revenue Shortfalls.*

The Guaranteed Accommodation Amount is based upon Purchaser's agreement that the Actual Net Onboard Revenue (as defined below) generated during the Cruise will equal or exceed **$473,518.88** USD (the

MUST BE STAMPED BY RCL LEGAL AND SIGNED BY A SVP OF RCL TO BE BINDING
PROPRIETARY AND CONFIDENTIAL

PURCHASER
Please Initial

4

("Guaranteed Onboard Revenue Amount") for the Cruise. If the Actual Net Onboard Revenue generated during the Cruise is less than the Guaranteed Onboard Revenue Amount, Purchaser shall pay to Cruise Line an amount equal to (the Guaranteed Onboard Revenue Amount minus the Actual Net Onboard Revenue). This amount shall be paid to Cruise Line within 30 days after receipt by Purchaser of the ANOR Report from the Cruise Line.

### Subsection 3.2.2    *Reporting of Actual Net Onboard Revenue.*

a. Reports During the Cruise.

During the Cruise, Cruise Line may provide Purchaser from time to time with reports on the estimated total Gross Revenue of sales reported during the Cruise. Purchaser acknowledges that the Gross Revenues reported are estimates based on the Cruise Line's systems and will be significantly different from the Actual Net Onboard Revenue for that Cruise.

b. Issuance of the ANOR Report.

Within forty-five (45) days after the end of the Cruise, Cruise Line shall generate and provide a report (the "ANOR Report") showing the Actual Net Onboard Revenue for the Cruise and calculating the difference between the Actual Net Onboard Revenue and the Guaranteed Onboard Revenue Amount.

### Subsection 3.2.3    *Calculation of Actual Net Onboard Revenue.*

As used in this Agreement, the term "Actual Net Onboard Revenue" shall mean the net revenue received by the Cruise Line from all onboard purchases made during the Cruise in the following areas:

- Casino and Bingo (gross amounts bet minus payouts for winners);
- Beverage Sales; including alcoholic beverages purchased on board during the Cruise as well as beverage packages sold by Purchaser prior to the Cruise
- Shore Excursions sold to guests on the Cruise; including pre-booked shore excursions
- Onboard Gift Shops & Retail Stores;
- Internet Services;
- Hair/Beauty/Spa Products & Services sold to guests on the Cruise;
- Art Auctions;
- Specialty Restaurants and other food and beverage venues;
- Telephone;
- Photo Products & Services;
- Laundry / Dry Cleaning Services;

For purposes of calculating Actual Net Onboard Revenue, the following rules or principles shall apply.

- With respect to certain onboard revenue generating activities on the Vessel, such as onboard gift shop sales, spa services, art auctions etc.), Purchaser acknowledges that these operations are run by independent third parties who pay a percentage of their total sales to the Cruise Line. In calculating Actual Net Onboard Revenue, the amounts actually received by the Cruise Line shall be included in calculating Actual Net Onboard Revenue, not the gross amount charged by those independent third

MUST BE STAMPED BY RCL LEGAL AND SIGNED BY A SVP OF RCL TO BE BINDING
PROPRIETARY AND CONFIDENTIAL



PURCHASER
Please Initial

parties. For example, if the third-party charges $1200 for a watch and pays a fee of 20% of that amount to Cruise Line, that 20% (or $240) would be counted towards Actual Net Onboard Revenue.

- With respect to Beverage sales, Shore Excursion sales, Internet services, Specialty Restaurants, Telephone and Laundry/Dry Cleaning services, the amounts counted towards Actual Net Onboard Revenue shall equal the gross revenue (after the application of any applicable discounts) derived from sales in each of these areas minus the associated cost of goods sold connected with such sales. For example, if by the end of the 2nd day of the Cruise, gross revenue from the sale of beverages equals $58,000 and the cost of the liquor used in providing those beverages was $23,000, then the amount that would count towards the calculation of Actual Net Onboard Revenue would be $35,000.

- Amounts collected in the form of gratuities (e.g. gratuities charged to the purchaser of an alcoholic beverage), and sales or VAT or similar taxes are not treated as revenue. (The gratuities paid pursuant to Article 4 below and the Taxes/NG Fees paid pursuant to ARTICLE 6 below are not related to onboard purchases and are not subtracted from gross funds received in connection with onboard purchases.)

- Amounts that are refunded back to the purchaser (whether in the form of refunds or chargebacks or otherwise) and amounts not actually collected from the purchaser (e.g. net bad debt) will reduce by a corresponding amount any amounts initially counted as revenue from onboard purchases.

Cruise Line reserves the right to set off any liabilities of the Purchaser to Cruise Line under this Agreement against any sum due to Purchaser under this Section 3.2.

> ### Subsection 3.2.4     *Disputes Regarding This Section 3.2.*

Purchaser agrees that the Actual Net Onboard Revenue figure reported to it by the Cruise Line shall be final and binding and not subject to challenge, dispute, audit or investigation of any kind in any context (including any litigation or arbitration) except as provided in this Subsection 3.2.2.

     i.    In lieu of the dispute resolution provisions, if any, set forth in this Agreement or otherwise available at law or equity, the parties hereby agree to the following exclusive dispute resolution procedures in connection with any disputes arising under this Section 3.2, including but not limited to disputes regarding the accuracy of the Actual Net Onboard Revenue amount calculated by Cruise Line, or under Subsection 3.1.3 with respect to any rebate due to Purchaser. Within twenty-five (25) days of the receipt of the ANOR Report, Purchaser may dispute the correctness of the information or calculations reported by Cruise Line by providing written notice to Cruise Line (the "ANOR Dispute Notice"). Time shall be of the essence with respect to that twenty-five (25) day period to deliver an ANOR Dispute Notice. If an ANOR Dispute Notice is timely provided by Purchaser, Purchaser may suspend any payment otherwise due under Subsection 3.2.1 and Cruise Line may suspend any payment otherwise due under Subsection 3.1.3 until that dispute has been fully resolved.

     ii.    Within seven (7) days after Cruise Line's receipt of the ANOR Dispute Notice, the parties shall begin discussions (via telephone or face to face meetings or otherwise) in good faith to attempt to resolve the disputes. In the event that the parties do not resolve one or more of the matters disputed, then beginning twenty (20) days after Cruise Line's receipt of the ANOR Dispute Notice, Purchaser shall have the right to send a notice (the "ANOR Demand") demanding that Cruise Line engage a professional accounting firm, selected by Cruise Line, solely for the purpose of providing the following information:

MUST BE STAMPED BY RCL LEGAL AND SIGNED BY A SVP OF RCL TO BE BINDING
PROPRIETARY AND CONFIDENTIAL

| PURCHASER |
|---|
| Please Initial |

Royal Caribbean Resale: Ver. 2017.10

a. the categories of revenue used by the Cruise Line in calculating the Actual Net Onboard Revenue (e.g. casino revenue, gift shop revenue, spa revenue, shore excursion revenue etc.);

b. reconciling the total amounts recorded in Cruise Line's books and records of gross revenue in each of those categories of revenue and, where applicable, the net amount paid to Cruise Line out of the gross revenue generated with the amounts used by the Cruise Line in its calculation of Actual Net Onboard Revenue;

c. verification that any amounts subtracted in calculating Actual Net Onboard Revenue fall into categories, as reflected in Cruise Line's books and records, that can, according to this Agreement, be subtracted (e.g. sales taxes and refunds or chargebacks as provided above); and

d. using the above information to provide its own calculation of Actual Net Onboard Revenue;

e. applying the applicable formula specified in this Agreement for calculating the shortfall amount due from Purchaser or for calculating the amount to be rebated to Purchaser pursuant to Subsection 3.1.3, as the case may be.

iii. Purchaser shall deliver any ANOR Demand to CRUISE LNE within sixty (60) days after receipt by Cruise Line of the ANOR Dispute Notice. Time shall be of the essence with respect to that 60-day period to deliver an ANOR Demand.

iv. The reasonably estimated costs of such engagement shall be paid by Purchaser to Cruise Line prior to the Cruise Line's retention of that accounting firm. The results of such calculation by the accounting firm shall be binding upon both Parties. If the calculation shows either that the net amount owed by Purchaser was overstated by more than $20,000 or that the net amount to be rebated to Purchaser pursuant to Subsection 3.1.3 was understated by more than $20,000, then Cruise Line shall reimburse Purchaser for the costs of such audit. Otherwise, Purchaser shall pay for the audit.

v. The results of the review by the accounting firm shall be used to recalculate any amounts due under this Section 3.2 and under Subsection 3.1.3 and payments of any adjusted balance due shall be made promptly after the recalculation.

vi. It is acknowledged and agreed by Purchaser that Cruise Line's onboard revenue books and records are extremely sensitive Confidential Information of Cruise Line and that Purchaser shall have no right to see or be provided with the gross revenues or Actual Net Onboard Revenues for any categories of income (or similar financial details), whether through access to Cruise Line documentation or in any report issued by the accounting firm. The accounting firm may report either the total Actual Net Onboard Revenue or such subcategories as Cruise Line may approve.

vii. Once disputes about the amounts due (if any) under this Section 3.2 or rebates due under Subsection 3.1.3 have been finally resolved as provided in this Subsection 3.2.2, if such amounts are not paid within the time frames established in this Section 3.2 or Subsection 3.1.3 (as applicable), a party may bring an action to enforce that debt (in the amount determined under this

MUST BE STAMPED BY RCL LEGAL AND SIGNED BY A SVP OF RCL TO BE BINDING
PROPRIETARY AND CONFIDENTIAL

PURCHASER
Please Initial

Section 3.2.2), as provided below.  Any claim to enforce the unpaid debt determined pursuant to this Section 3.2.2 shall be settled by arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

1. The number of arbitrators shall be one.

2. The place of arbitration shall be in Miami/Dade County, Florida.

3. The language(s) to be used in the arbitral proceedings shall be English.

viii. Except as may be required by law, neither a party nor the arbitrator[s] may disclose the existence, content or results of any arbitration without the prior written consent of both parties, unless to protect or pursue a legal right.

## ARTICLE 4.    GRATUITIES.

### Section 4.1.    *Guaranteed Gratuity Amount for the Cruise.*

Purchaser shall pay to Cruise Line a guaranteed gratuity payment (the "Guaranteed Gratuity Amount") which shall cover the Total # of Available Double Occupancy Berths as set forth in Section 1.2 above.  This amount is calculated as follows:

| Stateroom Type | Quantity | Double Occupancy Berths | Per Person Amount | Total Dollar Amount |
|---|---|---|---|---|
| Standard | 1,120 | 2,240 | $54.00 | $129,920.00 |
| Suite | 22 | 44 | $66.00 | $3,080.00 |
| **TOTAL** | 1,064 | 2,284 | | $133,000.00 |

If the number of Guests who actually sail on the Cruise is less than the Total # of Available Double Occupancy Berths, there shall be no reduction of the amount of gratuity due under this Section 4.1 and the full amount stipulated above shall remain due from Purchaser.  The Guaranteed Gratuity Amount shall be paid to Cruise Line as provided in ARTICLE 8 below.

### Section 4.2.    *Third and Fourth Guest Gratuities for the Cruise.*

For each Guest in excess of the number of Total # of Available Double Occupancy Berths (i.e., the third and fourth berth Guests) up to the Maximum Available Guest Berths on the Vessel, Cruise Line shall be paid the following gratuity:

$13.50 USD per person, per day for guests in standard staterooms;
$16.50 USD per person, per day for guests in suites.F

MUST BE STAMPED BY RCL LEGAL AND SIGNED BY A SVP OF RCL TO BE BINDING
PROPRIETARY AND CONFIDENTIAL

PURCHASER
Please Initial

8

The gratuity amounts due under this Section 4.2 (the "3rd & 4th Gratuity Amounts") shall be paid to Cruise Line as provided in Section 8.2 below.

## ARTICLE 5.    TAXES AND NG FEES.

### Section 5.1.    *Introduction.*

The CruiseFare and other fees and charges due from Purchaser as specified in this Agreement are exclusive of "Taxes/NG Fees." As used herein, "Taxes/NG Fees" means the sum of:

a.  any applicable governmental or quasi-governmental sales, use, value-added, stamp, excise, withholding tax or other taxes, duties, fees or charges (whether now in existence or hereafter imposed or changed) imposed or assessed in connection with this Agreement or the marketing and sale or distribution by Purchaser of the berths except for any taxes on Cruise Line's net income; and

b.  certain qualifying non-governmental port fees or charges to the extent permitted under the Assurance of Voluntary Compliance between Cruise Line and the State of Florida Attorney General.

Purchaser shall be responsible for any and all Taxes/NG Fees and the amounts otherwise due to Cruise Line under this Agreement shall not be reduced by the amount of any Taxes/NG Fees. Notwithstanding the foregoing, Purchaser shall not be responsible for any fees or penalties payable by Cruise Line as a result of Cruise Line's failure to pay any Taxes/NG Fees in a timely manner unless Purchaser failed to pay any Taxes/NG Fees in the amounts and within the time limits specified in this Agreement.

### Section 5.2.    *Prepayment of Taxes/NG Fees.*

The amount of such Taxes/NG Fees is currently unknown but a reasonable estimate of such Taxes/NG Fees is $185,300.92 for the Cruise. Purchaser shall prepay to Cruise Line the greater of: (i) the estimated amount of $185,300.92 for the Cruise; or (ii) $81.13 per person times the total number of guests booked on the Cruise as of forty-five (45) days prior to the Sail Date for that Cruise. Such amounts (the "Prepaid Taxes") shall be paid to Cruise Line at least thirty (30) days prior to the Sail Date for the Cruise.

### Section 5.3.    *Post-Cruise Adjustments.*

Within twenty (20) days after the end of the Cruise, Cruise Line shall calculate the actual number of guests on the Cruise and shall invoice Purchaser for any additional Taxes/NG Fees due or report to Purchaser any refunds due to Purchaser. Such additional Taxes/NG Fees (or such applicable refunds) shall be paid to Cruise Line (or refunded to Purchaser, as the case may be) within twenty (20) days after receipt by Purchaser of the invoice or report. Any refunds due to Purchaser shall be applied first against other amounts due from Purchaser under this Agreement.

## ARTICLE 6.    FUEL SURCHARGES.

Cruise Line reserves the right to impose a fuel surcharge ("Fuel Surcharge") on Purchaser if Cruise Line implements a fuel surcharge fleet wide for all guests. The amount of that Fuel Surcharge shall be determined by Cruise Line but shall not exceed the following limits:

*  For the 1st and 2nd guests in a stateroom, the Fuel Surcharge shall not exceed the product of $10.00 per day multiplied by the Total # of Double Occupancy Berths; and

MUST BE STAMPED BY RCL LEGAL AND SIGNED BY A SVP OF RCL TO BE BINDING
PROPRIETARY AND CONFIDENTIAL

PURCHASER
Please Initial

Royal Caribbean Resale: Ver. 2017.10

- The maximum Fuel Surcharge assessment per Stateroom and/or Suite shall be $40.00 USD.

Cruise Line must notify Purchaser that it has elected to impose the fuel surcharge at least thirty (30) days prior to the Sail Date. Payment of the Fuel Surcharge shall be due within twenty (20) days of receipt of such notice.

## ARTICLE 7.    WHAT'S INCLUDED.

Except as expressly provided in this Agreement, the CruiseFare for the Cruise includes all meals, entertainment and services normally provided to Guests on a regular cruise as of the Sail Date. Purchaser acknowledges that certain entertainment and services (for example, without limitation, Broadway shows and other entertainment, shops, specialty dining venues and other features are subject to change and may not be offered or may not be offered free of charge (without liability of Cruise Line) as of the Sail Date. The CruiseFare does not include any items of a personal nature such as shore excursions, gift shops, valet, massage, etc. or any other expenses for which Guests are normally assessed individual charges during regular cruises. The CruiseFare does not include pre-sailing and post-sailing packages, air transportation, or ground transportation to and from the Vessel or in the ports of call. Any additional amenities described in Schedule A will be provided at no additional charge to Purchaser (unless a charge is specifically listed for the amenity).

## ARTICLE 8.    PAYMENTS.

### Section 8.1.    *Guaranteed Accommodation Amounts.*

A total of $1,201,065.92 USD, representing the sum of:
- a.  the Guaranteed Accommodation Amount (specified in Section 3.1); and
- b.  the Guaranteed Gratuity Amount (specified in Section 4.1).

That amount shall be paid to Cruise Line in installments on the following dates:

| Payment Number | Due on or Before | Amount |
|---|---|---|
| Initial Deposit | Signing | $120,106.61 |
| Second Payment | August 4th, 2018 | $360,319.77 |
| Third Payment | October 4th, 2018 | $360,319.77 |
| Final Payment | December 4th, 2018 | $360,319.77 |

MUST BE STAMPED BY RCL LEGAL AND SIGNED BY A SVP OF RCL TO BE BINDING
PROPRIETARY AND CONFIDENTIAL



Royal Caribbean Resale: Ver. 2017.10

**Section 8.2.**   *Remainder of Prepayment Amounts Due.*

Based on the number of guests booked on the Cruise as of forty-five (45) days prior to Sail Date for that Cruise, Purchaser shall pay to Cruise Line by no later than thirty (30) days prior to the Sail Date for the Cruise the following amounts:

- The 3rd & 4th CruiseFare Amounts due under Subsection 3.1.2;
- The 3rd & 4th Gratuity Amounts due under Section 4.2;
- The Prepaid Taxes during under Section 5.2; and
- The cost of any amenities ordered by Purchaser for that Cruise that are not covered by Exhibit A.

Any other amounts due under Section 3.2 (if applicable) and ARTICLE 5, ARTICLE 6 and ARTICLE 7 above shall be paid as set forth in those respective articles or sections.

**Section 8.3.**   *Final Adjustments.*

After the end of the Cruise, a true-up shall be performed to determine the final amounts due under Section 3.2, 0, ARTICLE 5, ARTICLE 6, ARTICLE 7 and Exhibit A. Cruise Line shall invoice Purchaser for any remaining amounts due or reimburse any amounts due to Purchaser within twenty (20) days after the end of the Cruise. Any payments due from Purchaser or refunds due from Cruise Line shall be paid within 14 days after receipt of that invoice.

**Section 8.4.**   *Payment Instructions.*

Time shall be of the essence with respect to each of the payment due dates specified in Section 8.1 and Section 8.2.

All payments to Cruise Line under this Agreement shall be made to Royal Caribbean Cruises Ltd. at its offices located at 1050 Caribbean Way, Miami, FL 33132 and will be made in the form of a wire transfer (Check shall be acceptable for initial deposit only), utilizing the following wire transfer information.

**BANK WIRE TRANSFERS FOR PAYMENTS**

| | |
|---|---|
| Bank Name | JPMorgan Chase Bank |
| Bank Address | New York, New York |
| Bank ABA: | 021-000-021 |
| Bank Swift Code: | CHASUS33 |
| Bank Account Name: | Royal Caribbean Cruises Ltd |
| Bank Account Number: | 910-276-3274 |

(Please Earmark RE: [CRUISE PARTNERS LLC], [MARCH 4, 2019] (4N)/ROYAL CARIBBEAN INTERNATIONAL CHARTER PROGRAM ON ENCHANTMENT OF THE SEAS.)

All payments from Purchaser to be made under this Agreement shall be made in cleared funds, without any deduction or set-off and free and clear of and without deduction for or on account of any taxes, levies, imports, duties, charges, fees and withholdings of any nature now or hereafter imposed by any governmental, fiscal or other authority save as required by law. If Purchaser is compelled to make any such deduction, it will pay to the Cruise Line such additional amounts as are necessary to ensure receipt by the Cruise Line of the full amount which Cruise Line would have received but for the deduction.

MUST BE STAMPED BY RCL LEGAL AND SIGNED BY A SVP OF RCL TO BE BINDING
PROPRIETARY AND CONFIDENTIAL

PURCHASER
Please Initial

11

Royal Caribbean Resale: Ver. 2017.10

*Section 8.5.* *Currency.*

ALL CURRENCY AMOUNTS SPECIFIED IN THIS AGREEMENT SHALL BE IN UNITED STATES DOLLARS UNLESS OTHERWISE EXPRESSLY PROVIDED HEREIN.

*Section 8.6.* *Commissions.*

Purchaser agrees that no commissions of any kind shall be due by the Cruise Line to Purchaser or any third party who sells a berth. Purchaser agrees to communicate this to all persons who may be contacted or engaged by Purchaser to resell or aid in the resell of the berths.

## ARTICLE 9. LETTER OF CREDIT

Prior to or concurrently with the delivery to Cruise Line of this Agreement executed by Purchaser's authorized representative(s), Purchaser shall deliver to Cruise Line an original, irrevocable, transferable Standby Letter of Credit that:

a. Is sent to the attention of Cruise Line's Vice President and Treasurer at 1050 Caribbean Way, Miami, FL 33132, that:

b. Is in the amount of $1,080,959.31 (the sum of the Guaranteed Accommodation Amount plus the Guaranteed Gratuity Amount minus the 10% initial Deposit);

c. Expires on June 4, 2019 (about ninety (90) days following termination of the cruise covered by this Agreement);

d. Is issued by a commercial bank rated "A" or better by at least two of the following credit rating agencies: S&P; Moody's or Fitch; further provided that all credit rating agencies must rank that commercial bank at least "A" or better.

e. Provides that if the commercial bank is not located in the United States of America or if the issuing bank does not satisfy the requirements of paragraph "c" above, then the Letter of Credit must be confirmed by a commercial bank in the United States of America rated "A" or better by at least two of the following credit rating agencies: S&P; Moody's or Fitch; further provided that all credit rating agencies must rank that commercial bank at least "A" or better. Annexed as Exhibit D-1 is a list of select, pre-approved U.S. banks that can provide such confirmation (under the header "Pre-Approved Banks for Confirmations"). If the Letter of Credit is merely advised by a U.S. bank in this case, the Letter of Credit is unacceptable, since an advising bank does not assume liability for claims on the Letter of Credit.

f. Provides that regardless of who is the issuing bank and regardless of whether a confirming bank is used, the location where documents may be presented must be within Miami/Dade County or Broward County in the state of Florida.

g. Provides that time is of the essence with respect to the due date for delivery of the Letter of Credit;

h. Shall be substantially in the form set forth in Exhibit D-2 attached hereto, with such changes to the terms in such form as the issuing bank (or if applicable confirming bank) may require and as may be acceptable to the beneficiary thereof; to that end, prior to the issuance of the executed original Letter of Credit, Purchaser must provide to the Cruise Line for its approval the name(s) of the proposed bank(s) for issuing, advising and/or confirming the Letter of Credit, as well as the issuing bank's and confirming bank's unexecuted draft of such Letter of Credit.

MUST BE STAMPED BY RCL LEGAL AND SIGNED BY A SVP OF RCL TO BE BINDING
PROPRIETARY AND CONFIDENTIAL

PURCHASER
Please Initial

12

i.   Shall remain irrevocable in its current form; and

j.   References this Agreement and provides to RCL the unconditional right to draw upon the Letter of Credit in the event that Purchaser fails to make any payments due to RCL in accordance with the terms of this Agreement.

If the issuing or confirming bank's credit rating is downgraded below the minimums required by this ARTICLE 9, Cruise Line may require Purchaser, upon notice of not less than 30 days to have a new letter of credit issued by or confirmed by (as the case may be) another commercial bank that does satisfy the requirements of this ARTICLE 9 and which letter of credit has been approved by Cruise Line as provided in this ARTICLE 9.

Within (10) ten days of receipt of each installment payment under this Agreement, Cruise Line shall notify the issuing bank (or confirming bank as the case may be) that the Letter of Credit may be reduced by an amount equal to the installment payment received by Cruise Line. Notwithstanding the above, the LOC will not be stepped down below a minimum value of **US $300,000.00** prior to expiration.

## ARTICLE 10.   DEFAULT

### Section 10.1. *Definitions.*

As used in this Agreement, a "Default" shall be deemed to have occurred if: (a) any portion of the CruiseFare or other amounts due from Purchaser under this Agreement that is not paid by Purchaser by the due date(s) for such portion set forth in this Agreement and such portion(s) (collectively the "Amounts Due") has not been paid by Purchaser within seven (7) days following receipt of written notice from Cruise Line; or (b) if Purchaser shall otherwise be in material default under this Agreement, and such default has not been cured by Purchaser within seven (7) business days following receipt of written notice from Cruise Line. Upon the occurrence of a Default, then all outstanding balances, including but not limited to the CruiseFare shall immediately be due and payable.

In the event of a Default, Royal Caribbean Cruises Ltd. may draw on the Letter of Credit in the amount of the then outstanding balance of the CruiseFare or any other amount resulting from the breach. Drawing will occur upon presentation of Royal Caribbean Cruises Ltd.'s sight draft accompanied by a statement signed by an officer of Royal Caribbean Cruises Ltd. which shall state as follows:

> I (Insert Name and Title of Signer), a duly authorized officer of Royal Caribbean Cruises Ltd. do hereby certify that Cruise Partners LLC and/or its affiliates has/have failed to fulfill its/their obligations as per the terms and conditions of the Guest Accommodations Purchase Agreement, or substantially similar agreement bearing an Effective Date of March 20, 2018 (the "Agreement") with a cruise itinerary originally scheduled for completion on March 4, 2019). Pursuant to these terms and conditions of the Agreement, USD **$1,068,065.92** (One million Sixty-Eight thousand Sixty-Five dollars and Ninety-Two cents) is due and owing to Royal Caribbean Cruises Ltd. under Issuing Bank Name standby letter of credit number #####."

### Section 10.2. *Liquidated Damages.*

Each party hereby acknowledges the considerable uncertainty surrounding the ability of the parties to ascertain the damages that would be suffered by Cruise Line in the event of a Default by Purchaser under this Agreement. The uncertainty regarding the ability of Cruise Line to even offer the berths on the Vessel for resale, the difficulty of selling space on a Vessel without adequate lead time, the significant level of revenue derived by Cruise Line from onboard purchases and other factors all make ascertainment of the damages suffered by Cruise Line in the event of a breach difficult to ascertain as of the time of contracting. Accordingly, the parties

MUST BE STAMPED BY RCL LEGAL AND SIGNED BY A SVP OF RCL TO BE BINDING
PROPRIETARY AND CONFIDENTIAL

PURCHASER
Please Initial

Royal Caribbean Resale: Ver. 2017.10

agree that (except as provided in the following paragraph) upon the occurrence of a Default, Cruise Line may elect, at its option, to terminate this Agreement, and retain as liquidated damages the installment payments of the CruiseFare already received and any amounts received by drawing on the Letter of Credit to cover the sum of the CruiseFare, the Guaranteed Gratuity Amount, the Guaranteed Net Onboard Revenue and any other amounts or fees due from Purchaser hereunder. The retention of those installments shall be the Cruise Line's exclusive monetary remedy for failure of Vendor to make the required installment payments.

Damage claims for other breaches shall be governed by the normal rights and remedies available to Cruise Line at law or in equity.

## ARTICLE 11.     LIBERTIES

Cruise Line and the Vessel shall have the right to sail with or without pilots, to change the Vessel's flag, to tow or to be towed, to change the nationality of the crew (so long as the service and standards of the Vessel are maintained), to go to the assistance of other vessels in distress, to deviate for the purpose of saving life or property or landing any ill or injured person, and to call for repairs, fuel, stores and water at any port or ports in or out of the regular course of a Cruise, and Cruise Line and the Vessel shall have no liability to Purchaser for engaging in any of the foregoing.

## ARTICLE 12.     GUESTS

### Section 12.1.  *Tickets.*

Purchaser may sell tickets for berths on the Cruise to consumers and organizations at a price to be determined in Purchaser's sole discretion (collectively the "Guests"). No authorization or permission of any type is given to Purchaser by this Agreement to sell tickets for any other cruises or products or services offered by Cruise Line. Purchaser shall clearly and conspicuously disclose to each Guest prior to selling them a berth on the Cruise, the following information: (a) that any components of the Cruise or related to the Cruise that go beyond or are different from the products or services normally provided by Cruise Line are the sole responsibility of Purchaser; and (b) that any refunds of money or other compensation paid to Purchaser shall be the sole responsibility of Purchaser and in no event shall Cruise Line have any responsibility for the same.

### Section 12.2.  *Warranty.*

Purchaser warrants and represents regarding itself:  (i) that it is capable, experienced and fully staffed and qualified, with all requisite licenses, permits, inspections and approvals as may be required by any competent governmental or administrative authority in whatever territory the berths on the Cruise are marketed or sold (collectively the "Licenses"), to perform the functions contemplated by this Agreement, including any exhibits hereto; and (ii) that the Licenses shall be maintained throughout the term hereof and any renewals of this Agreement.

### Section 12.3.  *Liability.*

The liability of Cruise Line to Purchaser and to all Guests, except as otherwise provided in this Agreement, will be limited and governed by, and strictly in accordance with, the terms and conditions contained in the contract of passage for passengers sailing on vessels that have been reserved by Guest Accommodations Purchase Agreement or similar contracts (collectively the "Resale Ticket Contract") in effect at the time of January 1, 2018. (The Resale Ticket Contract varies depending on the location of the Guest.) A copy the current Resale Ticket Contract in effect as of the date of this Agreement for guests from the United States, can be located at www.rccl.com.com and the terms and conditions for carriage of passengers set forth in that United States

MUST BE STAMPED BY RCL LEGAL AND SIGNED BY A SVP OF RCL TO BE BINDING
PROPRIETARY AND CONFIDENTIAL

| PURCHASER | |
|---|---|
| Please Initial | |

version of the Resale Ticket Contract are expressly incorporated into and made part of this Agreement with the following exceptions:  Section 7 (excluding the last paragraph); Section 9 a; and Sections 10b and 10c.  The terms and conditions between Purchaser and Passengers shall not apply to the Cruise Line.  Among other things, the dispute resolution proceedings that Purchaser may establish in such terms and conditions shall not apply to any disputes between Purchaser and Cruise Line or between Cruise and Guests.

### Section 12.4.  *Indemnification.*

Purchaser will defend and hold Cruise Line and the Vessel harmless from any liability resulting from any claim made by any person for the return of any monies collected by Purchaser with respect to the Cruise or as a result of Purchaser's failure to deliver a ticket to any individual Guest.  This Section 12.3 shall survive the termination of this Agreement.

## **ARTICLE 13.**    **MARKETING**

### Section 13.1.  *Licenses and Permissions.*

Except as expressly set forth in this Agreement, no license or permission is granted to one party by this Agreement to use any trademarks, logos, slogans, copyrighted material or any other proprietary information of the other party.

To the extent that Purchaser or Cruise Partners LLC provides any content to Cruise Line, including promotional brochures, flyers, logos, pictures, music and meeting schedules (collectively, the "Content") for any reason, including for distribution onboard the Cruise, Purchaser hereby warrants that it has all rights, permissions, and licenses necessary to provide the Content to Cruise Line for its intended use.  Purchaser further warrants that it has all rights, permissions, and licenses necessary to display or perform all Content used by Purchaser or Cruise Partners LLC during the Cruise. With respect to any Content, Cruise Line shall have a non-exclusive royalty-free license to use the Content for the period beginning on the date of this Agreement until the last day of the Cruise.  Any such use by Cruise Line shall be subject to Purchaser's prior review and written approval but only if the Cruise Line modified the Content.

### Section 13.2.  *Cruise Line Standard Vessel Documentation.*

With respect to the Vessel, Cruise Line may provide Purchaser with standard marketing materials related to the Vessel and the services and amenities offered by Cruise Line regarding a standard sailing.  All marketing materials must be displayed in accordance with Cruise Line's marketing guidelines, copies of which are available upon request.  Such standard marketing material may be used only regarding the Cruise.  Purchaser shall be responsible for determining whether any information contained in such standard marketing material is false, incorrect, or misleading in light of the additions, deletions, customizations or other changes that Purchaser plans to make to the standard cruise that would normally be provided by Cruise Line.

If any such marketing material would, with respect to the Cruise, be false, incorrect, or misleading, Purchaser shall refrain from using such marketing materials and shall take such steps as are prudent to correct such false, incorrect or misleading information.

Purchaser may not produce or create, or authorize others to produce or create, any marketing, advertising or promotional materials (including but not limited to brochures, flyers and e-mail messages) regarding the Cruise

PURCHASER
Please Initial

15

that utilize any trademarks, logos, slogans or vessel names without the Cruise Line's express prior written consent as provided in Section 13.3 below.

With Cruise Line's prior written consent, Purchaser may directly translate Cruise Line's standard marketing documentation into the native language, of the territory to assist in the sale of the staterooms. Prior to the production of such translations, Purchaser shall provide to Cruise Line a copy of such translation for Cruise Line's approval prior to distribution. In no case shall the translated documentation differ, alter or change the meaning, intent from its original purpose. Notwithstanding such review and approval by Cruise Line, Purchaser shall be solely responsible for the accuracy and completeness of any such translations. Purchaser grants to the Cruise Line title to any such translations.

### Section 13.3.   *Approval Process for Purchaser Created Marketing Materials.*

Purchaser must obtain the prior written approval of Cruise Line with respect to the form and content of all advertising or marketing materials or press statements bearing the trademarks, logos, tag lines or slogans of Cruise Line or its affiliates (collectively the "Service Marks") or bearing any copyrighted material or any other proprietary information of the Cruise Line or any press statements related to the prior to their use. To obtain such approval, submit any:

   a.  Proposed marketing or advertising materials;

   b.  Press releases or other similar materials.

Nothing in this Agreement shall constitute approval to use any Service Marks in connection with the creation or branding of any product or service Cruise Line will inspect all materials upon which the Service Marks are placed, for the purpose of ascertaining or determining acceptable quality of Purchaser's use of the Service Marks and compliance with this Agreement. Purchaser agrees to provide Cruise Line with samples of all materials bearing the Service Marks that are manufactured or made by or on behalf of Purchaser. Cruise Line may reject and prohibit the use of any materials bearing the Service Marks that do not comply with this Agreement or are not suitable for any reason at its discretion. Cruise Line has a set of style guidelines as described in its brand manual, which from time to time is updated. Any marketing materials approved by Cruise Line shall be required to work within the Style Manual's guidelines.

### Section 13.4.   *Confusing Marks.*

Neither party will establish or use any word or mark which is similar to or likely to be confused with the trademarks, service marks or logos of the other party for any purpose, including, but not limited to, any level domain name, without first obtaining that other party's prior written consent or consistent with such guidelines as may be issued by that other party from time to time.

### Section 13.5.   *Robocalls, Auto dialers and Faxes.*

Cruise Line strictly forbids and does not authorize the use of Solicitations (as defined below) to any consumer, business or other person or entity by means of an Automated Promotional Tool. Purchaser hereby represents and warrants that it has not and covenants that it shall not engage in Solicitations to any consumer, business or other person or entity by means of an Automated Promotional Tool to promote, market or otherwise solicit customers for (a) the Cruise or the Cruise Line, (b) any services or products offered by Cruise Line to any guests

MUST BE STAMPED BY RCL LEGAL AND SIGNED BY A SVP OF RCL TO BE BINDING
PROPRIETARY AND CONFIDENTIAL

PURCHASER
Please Initial

at any time, potential guests or consumers on the Cruise or in connection with the Cruise or (c) any services or products offered by Purchaser or any third party in connection with the Cruise.

As used in this Section, the term "Solicitation" shall mean a communication to advertise, promote, market, solicit, or any other communication covered by the Telephone Consumer Protection Act (TCPA) and any other applicable federal or state law

As used in this Section, the term "Automated Promotional Tools" shall mean systems (such as auto-dialing or predictive dialing systems) for sending the following types of communications: promotional telephone solicitations; text messages; faxes; artificial or prerecorded voice messages; or any other form of communication covered by the TCPA and any other applicable federal or state laws.

Notwithstanding anything to the contrary in this Agreement, any violation of this Section shall constitute a material breach of this Agreement with respect to which Purchaser shall have three (3) business days after receipt of notice of such breach to cure. The cure shall consist at a minimum of the immediate cessation of all Solicitations using Automated Promotional Tools and the cancellation of any bookings made in violation of this Section 13.5. Depending on the circumstances, additional curative steps may be required by Cruise Line.

Purchaser specifically acknowledges and agrees that it shall require any third parties directly or indirectly engaged in marketing or promoting for Purchaser to comply with this Section prohibiting Solicitations using Automation Promotional Tools in compliance with this Section, the TCPA and any other applicable federal or state law. Purchaser shall strictly enforce these requirements against such third parties consistent with the specific terms of this provision.

## **ARTICLE 14.** BERTHING ASSIGNMENTS, TICKETING DOCUMENTATION AND TRAVEL DOCUMENTS

### *Section 14.1. Berthing Assignments.*

Purchaser shall arrange the berthing of its Guests consistent with the Cruise Line's policies and procedures which are available upon requests.

#### Subsection 14.1.1 *Initial Berthing List.*

Purchaser shall provide its list of berthing assignments (the "Initial Purchaser Berthing Assignments") to the Cruise Line no later than forty-five (45) days prior to the Sail Date. That list shall contain for each guest, the following information:

- guest's full name,
- full mailing address for the guest's country of residence,
- country of citizenship,
- the email address for the guest (which cannot be an email address for Purchaser or its staff) and
- such other details as Cruise Line may reasonably request.

Cruise Line reserves the right to deny boarding to any person whose personal details listed above are either inaccurate or incomplete. No refund shall be made with respect to such persons.

After receipt of the Initial Purchaser Berthing Assignments, Cruise Line shall generate a berthing list (the "Initial Berthing List"). That Initial Berthing List shall be provided to Purchaser typically within three (3) days after receipt of the Initial Purchaser Berthing Assignments. Purchaser shall review and provide corrections or

PURCHASER
Please Initial

confirmation of the information contained in the Initial Berthing List within three (3) business days after receipt thereof.

### Subsection 14.1.2    *Later Bookings.*

From time to time, new bookings may be made after the generation of the Initial Purchaser Berthing Assignments or changes to existing bookings shown on the Initial Purchaser Berthing Assignments may be made. Such changes shall be processed as follows:

   a.    Purchaser shall notify Cruise Line of any new bookings or changes to existing bookings within three (3) business days after the booking was made or the change requested;

   b.    Cruise Line shall respond to those changes.

New bookings and changes to existing bookings can only be made up to ten (10) days prior to the Sail Date.

### Section 14.2.  *Issuance of Electronic Tickets.*

### Subsection 14.2.1    *Based on the Initial Berthing List.*

Based on the Initial Berthing List, no later than thirty (30) days prior to the Sail Date Cruise Line shall prepare and make available such edocs to Purchaser, and Purchaser shall cause such edocs to be delivered to the individual Guests at least twenty-one (21) days prior to the Sail Date. The edocs may vary depending on the country of residence for the guest. Purchaser accepts full responsibility for delivery of an electronic ticket to each of the Guests as provided in the preceding sentence. Purchaser shall require that each individual Guest sign his or her ticket prior to boarding or completes the online registration process at www.rccl.com and acknowledge that he or she shall be bound by the terms of such ticket.

### Subsection 14.2.2    *Based on Later Bookings.*

Purchaser shall provide to Cruise Line within twenty-four (24) hours after accepting a booking, the names of any Guests who purchase a ticket between the time Purchaser sends to the Cruise Line the list described in the preceding paragraph and the Sail Date for that cruise. With respect to any Guests whose names are received at least ten (10) days prior to the Sail Date, the Cruise Line shall prepare and make available to Purchaser electronic tickets for such Guests and Purchaser shall cause such electronic tickets to be delivered to the individual Guests at least five (5) days prior to the Sail Date.

### Section 14.3.  *Travel Documentation.*

Purchaser acknowledges that all of its Guests must possess such documents, inoculations or other requirements as may be necessary to enable them to embark, visit and disembark at the various ports of call described in ARTICLE 2 above (including any changes made pursuant to this Agreement) and Cruise Line reserves the right to deny, without penalty or liability, the right to board the Vessel to any Guest who does not possess or satisfy the necessary requirements.

The foregoing shall be without prejudice to the Cruise Line's right to offer Guests onboard such incentives or compensation as the Cruise Line may determine to be appropriate in the circumstances. For example, and

| PURCHASER |
|---|
| Please Initial |

without limiting the possible responses of the Cruise Line, the Cruise Line may offer an open bar for a period of time, offer onboard ship credits or offer credits towards future cruises with the Cruise Line.

## **ARTICLE 15.**   ONBOARD SALES, ENTERTAINMENT, FILMING AND MEDIA

### Section 15.1.   *Onboard Sales.*

#### Subsection 15.1.1   *General Prohibitions.*

Purchaser acknowledges that various concessionaires onboard each Vessel have the exclusive right to sell or otherwise offer many different types of merchandise or services onboard the Vessel (including but not limited to general merchandise such as clothing, shoes, hats, lotions, shades and souvenirs, canned or bottled drinks, photography services, spa services and artwork) and may have the exclusive right to market shore side vendors to Guests on the Vessel.  Purchaser agrees that it shall not, and shall not make any arrangements with third parties to, engage in any of the following conduct:

- Sell any goods or services on the Cruise;

- Advertise or promote to Guests while on the Cruise goods or services for purchase;

- Advertise or promote to Guests while on the Cruise any shore side shops or establishments at which Guests may purchase products or services;

- Provide any products or services onboard the Cruise without charge, such as photography services and spa or health related services, except as may be approved pursuant to **Error! Reference source not found.** below.

- Advertise or promote prior to the Cruise goods or services that would be delivered to Guests during the Cruise.

#### Subsection 15.1.2   *Onboard Sales.*

Notwithstanding the provisions of Subsection 15.1.1 above, Purchaser shall have the right to:

- **a.** Bring onboard the Vessel and sell in locations to be designated by CRUISE LINE Purchaser's concert souvenirs, and band merchandise during the Cruise (collectively "Approved Merchandise").  Purchaser is required to pay to Cruise Line thirty percent (30%) of the gross revenue from the sale of Approved Merchandise; provided, however, that no compensation to Cruise Line shall be required if Purchaser and the applicable Concessionaire operating onboard the Vessel agree to an alternative compensation structure which is also approved by Cruise Line.

- **b.** Advertise or promote the sale onboard of Approved Merchandise through such means and in such volume as may be approved by CRUISE LINE in its discretion;

- **c.** Provided that Purchaser and the concessionaire Royal Media Partners agree to a mutually acceptable compensation arrangement (which arrangement is also approved by Cruise Line) , Purchaser may advertise or promote (subject to Cruise Line's approval of the manner and frequency of such advertisements or promotions) shore side shops or establishments  in which Guests may purchase products or services;

- **d.** Collect using its own payment systems, payment for such Approved Merchandise either  in advance, onboard or post cruise  and either through its own sales representatives  onboard the Vessel.

MUST BE STAMPED BY RCL LEGAL AND SIGNED BY A SVP OF RCL TO BE BINDING
PROPRIETARY AND CONFIDENTIAL

**PURCHASER**
**Please Initial**

19

If Purchaser desires to engage in any conduct prohibited by Section 15.1.1 but not allowed by this Subsection 15.1.2, Purchaser must obtain the prior written approval therefore from Cruise Line's Vice President, Onboard Revenue, acting in his or her sole discretion.

### Subsection 15.1.3 *Closing of Concessionaire Operations.*

Should Purchaser desire to have an onboard concession (including but not limited to the casino, specialty restaurants, shops, or photo service) closed during the cruise, then Purchaser must obtain Cruise Line's Vice President, Onboard Revenue approval of any such arrangement and shall be responsible for compensating any applicable concessionaire and Cruise Line for lost revenue. The amount of such lost revenues shall be established by Cruise Line & Concessionaire based on revenues derived on similar voyages.

### Section 15.2. *Entertainment and Features.*

Any additional entertainment, equipment, services, lectures or other matters that Purchaser desires to provide or have occur on the Cruise shall be subject to the prior written approval of Cruise Line, in each case in its sole discretion. If Purchaser desires to provide or have occur on the Cruise any such items, it shall notify Cruise Line by no later than six (6) months prior to the date of embarkation and such notice shall include or be promptly supplemented by any additional information requested by Cruise Line.

### Section 15.3. *Filming and Media Onboard.*

Purchaser shall have no right to bring any press, radio, television or internet correspondents, photographers or camera crews, bloggers or online journalists onboard the Vessel under any circumstances without Cruise Line's prior written approval. All such requests for approval must be submitted no later than 60 days prior to embarkation and shall be subject to the written approval of Cruise Line's Corporate Communications and Public Relations Department as well as Purchaser entering a separate Location Agreement with Cruise Line.

### Section 15.4. *Equipment and Goods and Early Boarding.*

To the extent that Purchaser has obtained approval for equipment or persons to be brought onboard as provided in this ARTICLE 15, arrangements for delivery and loading of such equipment (and unloading and removal from the pier for such equipment) shall be established as advised from time to time by Cruise Line

## ARTICLE 16.    FORCE MAJEURE

If Cruise Line is forced to cancel the Cruise due to Acts of God, breakdown of the Vessel, hostilities, blockades, labor conflicts, strikes aboard or ashore, restraint of rulers or princes, war, fire, collision, directions of underwriters, arrest, order or restraint by governmental authorities or others, acts of terrorism, civil commotions, weather conditions and considerations of safety of the Vessel (of which the Master shall be the sole judge), foundering of the Vessel or breakdowns of or damage to its hull, machinery and fittings, inability to secure or failure of supplies including fuel, requisition of the Vessel or other circumstances beyond the Cruise Line's control (including but not limited to a change in Cruise Line's fleet deployment caused by any of the aforementioned events) (collectively such causes shall be referred to as "Force Majeure Events"), the sole

MUST BE STAMPED BY RCL LEGAL AND SIGNED BY A SVP OF RCL TO BE BINDING
PROPRIETARY AND CONFIDENTIAL

PURCHASER
Please Initial

liability of Cruise Line, and/or the Vessel, shall be for refund of all monies theretofore paid by Purchaser to Cruise Line hereunder for all obligations not then performed or for which the Purchaser has not had benefit.

## ARTICLE 17.    DELAYS:

### Section 17.1.  *Purchaser Delays.*

If a delay in embarkation is caused by Purchaser or by the Guests or by the failure of connecting carriers in transporting of Guests to the port prior to departure, then and in those events, Purchaser shall reimburse and pay to Cruise Line any additional costs arising directly from said delay including, but not limited to, Stevedores, crew, port costs, fuel, food and overtime.  Purchaser agrees to pay Cruise Line for such additional expenses within thirty (30) days after receipt of a billing therefore from Cruise Line.

### Section 17.2.  *Cruise Line Delays.*

For the purposes hereof, the term "Cruise Line Delay" shall mean a delay in embarkation caused by Cruise Line, including a delay caused by engine or other mechanical breakdown of the Vessel:

i.  If a Cruise Line Delay continues for a period exceeding twenty-four (24) hours from the scheduled embarkation time, but less than forty-eight (48) hours from the scheduled embarkation time, Cruise Line shall refund to Purchaser, within thirty (30) days, a prorated portion of the CruiseFare (exclusive of embarkation and other port taxes levied by any agency) for each twelve-hour period of delay up to forty-eight (48) hours.

If a Cruise Line Delay continues for a period beyond forty-eight (48) hours from the scheduled embarkation time, either party may elect to terminate this Agreement by written notice to the other party received within sixty (60) hours from the scheduled embarkation time.  In such event, the sole responsibility of Cruise Line and/or the Vessel shall be to refund all monies of the CruiseFare theretofore paid by Purchaser.

### Section 17.3.  *Partial Refund.*

If, after commencement of the Cruise, Cruise Line is unable to complete the Cruise by reason of any cause not under the control of Purchaser, including but not limited to Force Majeure Events, Cruise Line shall refund to Purchaser, within (30) days, a prorated amount for the number of days eliminated from the Cruise.  For purposes of this subsection (c), each Cruise day shall be deemed to commence at 12:01 A.M. (local time).  Any cruise that is canceled after 12:01 P.M. (local time) shall be deemed to be a full day of completed cruise for purposes of this paragraph.  The time involved in returning to port of embarkation shall be deemed to be included in the cruise time, provided all services and accommodations are available to Guests at that time.

## ARTICLE 18.    VESSEL SUBSTITUTION

Cruise Line, upon notice to Purchaser, may substitute another of its similarly classed ships for the Vessel. However, nothing in this Agreement shall obligate the Cruise Line to provide a substitute vessel.

## ARTICLE 19.    FMC CERTIFICATE

Cruise Line represents that, to the extent required by applicable law, the Federal Maritime Commission, Washington, D.C., has issued Vessel a certificate of financial responsibility in accordance with Section III of

MUST BE STAMPED BY RCL LEGAL AND SIGNED BY A SVP OF RCL TO BE BINDING
PROPRIETARY AND CONFIDENTIAL

PURCHASER
Please Initial

21

U.S. Public Law 89-777. Cruise Line represents that, to the extent required by applicable law, the Cruise Line will keep such certificate in full force and effect through the end of the cruise.

## ARTICLE 20.      NOT A VESSEL CHARTER

Nothing in this Agreement shall be construed as a charter of anything; Purchaser is purchasing the total Guest accommodations of the Vessel to the Purchaser, and, Cruise Line shall retain all its rights and be subject to all its obligations as operator, including but not limited to, the itinerary, navigation and management of the Vessel and the carriage of Guests, cargo and crew.

## ARTICLE 21.      LIMITATION OF LIABILITY STATUTES

### Section 21.1.   *Excluded Damages.*

Cruise Line is entitled to the benefit of any applicable maritime laws and conventions providing for limitation and exoneration of liability, and nothing in this Agreement is intended to operate to limit or deprive Cruise Line of any such limitation of or exoneration from liability.

### Section 21.2.   *General Limitation of Liability.*

Except as may be expressly provided in this Agreement, under no circumstances whatsoever shall Cruise Line be liable for any special, consequential, punitive, indirect, or incidental damages of any kind whatsoever.

### Section 21.3.   *Laws, Treaties and Conventions.*

Notwithstanding any other provision of this Agreement, Cruise Line shall retain and have the benefit of all rights, privileges and immunities available to it under any applicable law, treaty or convention, including but not limited to those contained in 46 U.S.C. Sections 181-188 and the International Convention on Limitation of Liability for Maritime Claims 1976, (the "ICLLMC"); provided that the limitations set forth in the ICLLMC shall be calculated based on the number of guests without regard to the fact that the tickets have been purchased by a single purchaser.

## ARTICLE 22.      INDEMNIFICATION

### Section 22.1.   *Indemnification.*

Purchaser shall defend, indemnify and hold harmless (and pay any and all reasonable attorney's fees, in connection therewith) the owners, any charterers, Cruise Line and any other operators of the Vessels and their respective directors, officers, employees and agents from and against any claims, suits, and liens of whatever nature to the extent arising out of:

    i.    any claim by a third party resulting from Purchaser's breach or alleged breach of any term or condition of this Agreement; and

    ii.    any claim by a third party arising out of Purchaser's negligent or intentional acts or omissions in performing its obligations under this Agreement; and

    iii.    any claim made by Purchaser's personnel against Cruise Line for an employment or crew related matter, including but not limited to claims for maintenance, cure, unearned wages, Jones Act claims, unpaid wages and penalties; provided, however, that Purchaser shall not be

MUST BE STAMPED BY RCL LEGAL AND SIGNED BY A SVP OF RCL TO BE BINDING
PROPRIETARY AND CONFIDENTIAL

PURCHASER
Please Initial

obligated to indemnify Cruise Line for any such claims that are based solely on alleged negligence or intentional misconduct by Cruise Line or its employees.  The indemnification provided for by this Section 22 shall cover any punitive or other exemplary damages that may be awarded to Purchaser's personnel.

**Section 22.2.**  *Procedural Matters*

Cruise Line shall give prompt written notice to Purchaser of the assertion or commencement of any claim, demand, investigation, action, suit or other legal proceeding (collectively, "Claim") in respect of which indemnity is or may be sought hereunder; provided that the failure to provide such notice shall not relieve Purchaser of its indemnity obligations unless such party is mutually prejudiced by such failure. Within thirty (30) days of its receipt of sure notice, Purchaser shall have the right to assume the defense or settlement of any third-party Claim in respect of which it is obligated to provide indemnity hereunder; provided, however, that (i) the Purchaser shall confirm, in writing to Cruise Line, that Cruise Line is entitled to be indemnified for any losses arising out of such Claim, and (ii) the Purchaser  shall not settle or compromise any such Claim without the Cruise Line's prior written consent thereto.  Notwithstanding the foregoing, the Cruise Line at all times shall have the right, at its option and expense, to participate fully in the defense or settlement of such Claim.

This Section 22 shall survive the expiration or termination of this Agreement.

## ARTICLE 23.     CONFIDENTIALITY

"Confidential Information" means tangible and intangible nonpublic information that one party discloses to the other and designates as confidential or which, under the circumstances surrounding such disclosure, ought to be treated as confidential.  "Confidential Information" includes, but is not limited to, the terms and conditions of any proposed or actual agreement between the parties, including the Cruise and the Cruise Itinerary; either party's business policies, practices or trade secrets; and the information of others that is received by either party under an obligation of confidentiality.  As between the Cruise Line and Purchaser, the names, addresses, telephone numbers and email addresses of Guests onboard the Cruise shall not be considered to be the confidential information of either Party but when held by a Party shall be subject to that Party's applicable privacy policies.  In any event, each Party shall be responsible for complying with any applicable privacy laws related to such personal data.  Neither Party shall disclose, advertise, or publish any Confidential Information of the other Party to any third party nor use such Confidential Information other than for the performance of its obligations under this Agreement.

To the extent Purchaser provides any Personal Data (as defined in the EU's Global Data Protection Regulation) Cruise Line, including but not limited to Purchaser's contact information and Personal Data regarding Purchaser's members and meeting attendees (collectively, the "Group Data") for any reason, Purchaser hereby represents, warrants and covenants that, prior to providing Cruise Line with the Group Data, Purchaser shall have obtained all rights and permissions necessary to:

    i.      provide the Group Data to Cruise Line,

    ii.     transfer the Group Data to locations both within and outside the point of collection, including to the United States, and (iii)

    iii.    grant to Cruise Line the right to use or release the Group Data to Royal Caribbean Cruises Ltd. ("RCL"), RCL's affiliates, and other entities and locations within the RCL reservation, sales and

MUST BE STAMPED BY RCL LEGAL AND SIGNED BY A SVP OF RCL TO BE BINDING
PROPRIETARY AND CONFIDENTIAL

PURCHASER
Please Initial

Royal Caribbean Resale: Ver. 2017.10

catering, and database management systems for the period beginning on the date of this Agreement until March 9, 2019.

## ARTICLE 24.   COMPLIANCE WITH LAWS.

Purchaser shall at all times comply with all Laws applicable to this Agreement, Purchaser's performance of its obligations hereunder and Purchaser's use or sale of the berths on the Cruise. Without limiting the generality of the foregoing, Purchaser shall (a) at its own expense, maintain all certifications, credentials, licenses and permits necessary to conduct its business relating to the purchase, marketing, sale or use of the berths on the Cruise and (b) not engage in any activity or transaction involving the Cruise that violates any Law.

### Section 24.1. *A.D.A. Compliance.*

Cruise Line is subject to the requirements of the U.S. Department of Transportation Final Rule 'Transportation for Individuals with Disabilities: Passenger Vessels', 49 Code of Federal Register Part 39 (the "ADA Rule"). The rule is intended to ensure nondiscrimination of guests by passenger cruise lines on the basis of disability in accordance with the Americans with Disabilities Act.   Under the terms of the ADA Rule, Cruise Line must ensure that any person or entity that is a U.S. travel agent that offers, books or sells cruises on Cruise Line's vessels meets the applicable requirements of the ADA Rule to the same extent as if Cruise Line was providing the service itself.

Accordingly, and as an express condition to the engagement and/or appointment by Cruise Line of Purchaser, Purchaser hereby represents that to the extent it is a U.S. travel agent that offers, books or sells cruises on Cruise Line's vessels, the following shall apply to Purchaser:

    a.   it represents and warrants that it is familiar with the requirements of the ADA Rule as they apply to its services;

    b.   it hereby covenants and agrees that:

        i.   it shall comply with all applicable provisions of the ADA Rule when providing services to Cruise Line's guests or providing services that affect Cruise Line's guests or when performing services as a U.S. travel agent on behalf of guests or prospective guests of Cruise Line; and

        ii.   it shall implement any directives issued by those persons Cruise Line designates as its experts in compliance with the requirements of the ADA Rule who are tasked with the authority to resolve guest complaints (the "Complaints Resolution Officials").

Failure by Purchaser to comply with the foregoing shall constitute a material breach by Purchaser of this contract of engagement or appointment, and Purchaser shall indemnify and hold Cruise Line harmless from any and all claims, costs, expenses and liabilities suffered by Cruise Line as a result of such noncompliance.

### Section 24.2. *Trading Sanctions.*

Purchaser acknowledges that under applicable U.S. law, including but not limited to sanctions administered by the U.S. Treasury Department's Office of Foreign Assets Control (OFAC) (the "OFAC Regulations" ), US persons (such as Cruise Line or its parent or affiliates) are prohibited from engaging in most types of transactions with any citizen or resident of specific countries, including Cuba, Iran, North Korea, Syria, Sudan, or any country whilst they are subject to sanctions administered by OFAC.   These broad sanctions may be referred to herein as "Country-Wide Sanctions."   In addition, US Persons are prohibited from engaging in certain types of transactions (including providing passage on a cruise vessel) with specific individuals or entities whose names appear on OFAC's List of Specially Designated Nationals and Blocked Persons (or "SDN List").

MUST BE STAMPED BY RCL LEGAL AND SIGNED BY A SVP OF RCL TO BE BINDING
PROPRIETARY AND CONFIDENTIAL

PURCHASER
Please Initial

24

Purchaser hereby agrees that it shall be responsible for being familiar with the US sanction laws and regulations and to ensure that its actions do not cause Cruise Line to be in non-compliance with those laws and regulations (including the OFAC Regulations). To that end, Purchaser shall screen its customers or guests so that no person who resides in or is a citizen of a country subject to Country-Wide Sanctions or who is on the SDN List will be sold or provided a berth on a Cruise Line vessel unless: (a) Purchaser identifies such customer(s) in writing to Cruise Line's legal department along with the basis for why Purchaser believes such customer can sail on the vessel; and (b) the Cruise Line's legal department approves in writing permitting the customer to sail. Purchaser acknowledges that Cruise Line may deny boarding to any customer who is subject to such sanctions and further deny any refund of any payments made by such customer (or take other actions) as required by applicable law. The portion of the compensation due from Purchaser to Cruise Line that shall be attributed to such customers shall be determined by Cruise Line (in its sole discretion). Purchaser also agrees to refrain from advertising or marketing this program (directly or indirectly, e.g. through travel agencies) to customers in Cuba, Iran, North Korea, Syria, Sudan or any other country that becomes subject to a Country-Wide Sanction).

### Section 24.3.  *Anti-Corruption.*

Purchaser has not taken, and will not take, any action in furtherance of an offer, payment, promise to pay, or authorization of the payment of any money, gift or of anything of value, directly or indirectly, to any government official or private person, or demand or accept the foregoing for the benefit of: (1) influencing, inducing or rewarding any act or decision by such person or by Purchaser to do or omit to do any act in violation of his or her lawful duty, (2) influencing, inducing or rewarding the improper performance of a relevant function or activity by such person or by Purchaser, (3) securing any improper advantage for such person or Purchaser, (4) inducing such person or Purchaser to use his or her influence with any governmental or private entity to affect any act or decision of the entity for the benefit of Purchaser's business. For the avoidance of doubt, (i) the term "government official" includes any (1) officer or employee of government, department, agency, or instrumentality of a government (government-controlled enterprise), (2) public international organization or person acting in an official capacity, (3) political party or party official, (4) candidate for political office; and (ii) the practices prohibited hereunder include making facilitation payments or "grease payments" to government officials to expedite routine non-discretionary government action (e.g. processing permits, visas and licenses, scheduling inspections, clearing customs, etc.).

## ARTICLE 25.   GENERAL.

### Section 25.1.  *Governing Law.*

This Agreement shall be governed by and construed in accordance with the laws of the State of Florida including, where relevant, maritime law of the United States.

### Section 25.2.  *Choice of Forum.*

Each Party irrevocably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind whatsoever against the other Party in any way arising from or relating to this Agreement, including all exhibits, schedules, attachments and appendices attached to this Agreement and thereto, and all contemplated transactions, including contract, equity, tort, fraud and statutory claims, in any forum other than any Federal court located in Miami, Florida or , if such court does not have subject matter jurisdiction, the courts of the State of Florida sitting in Miami, and any appellate court from any thereof. Each Party irrevocably and unconditionally submits to the exclusive jurisdiction of such courts and agrees to bring any such action, litigation or proceeding only in any Federal court located in Miami, Florida or, if such court does not have

MUST BE STAMPED BY RCL LEGAL AND SIGNED BY A SVP OF RCL TO BE BINDING
PROPRIETARY AND CONFIDENTIAL

| PURCHASER | |
|---|---|
| Please Initial | |

Royal Caribbean Resale: Ver. 2017.10

subject matter jurisdiction, the courts of the State of Florida sitting in Miami, and any appellate court from any thereof. Each Party agrees that a final judgment in any such action, litigation or proceeding is conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law. All costs of such litigation, including reasonable attorneys' fees, shall be recovered by the prevailing party.

**Section 25.3.** *Expenses.*

All costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses.

**Section 25.4.** *Notices.*

All notices, demands, requests and other communications (collectively, "Communications") required or permitted to be given to any party pursuant to this Agreement (I) must be in writing and (ii) may be served either by (A) depositing the same in the United States mail, full postage prepaid, certified or registered with return receipt requested, (B) delivering the same by a nationally recognized overnight air courier service, full delivery cost paid, or (C) delivering the same in person. Any Communication shall be deemed received when delivered in person, three business days after sending by United States mail or one business day after sending by overnight courier. For the purpose hereof, the addresses of the parties hereto are as follows:

If to Purchaser:

        Cruise Partners LLC
        317 Davis Street
        Clarks Summit, PA 18411


        Attn: Jim Verano

With a copy to:


If to Cruise Line:        Royal Caribbean Cruises Ltd.

        1050 Caribbean Way
        Miami, Florida  33132
        Attn.: Vicki Freed, Senior Vice President, Marketing and Sales

With copies to:        General Counsel
        Royal Caribbean Cruises Ltd.
        1050 Caribbean Way
        Miami, Florida  33132
        Fax: (305) 539-0562


Any party hereto may change its address for the purpose hereof by giving notice of such change of address to the other party in the manner provided herein.

MUST BE STAMPED BY RCL LEGAL AND SIGNED BY A SVP OF RCL TO BE BINDING
PROPRIETARY AND CONFIDENTIAL

PURCHASER
Please Initial

26

Royal Caribbean Resale: Ver. 2017.10

### Section 25.5. *Waiver of Liens.*

Purchaser waives any lien rights it has or may acquire which arise out of or are connected with this Agreement or the breach thereof, or are provided by law or which otherwise may arise. Purchaser further waives any rights it has or may acquire to arrest or attach the Vessel or any other tangible or intangible property of Cruise Line on account of any claim against Cruise Line arising out of or connected with the Agreement. Purchaser shall not arrest or attach the Vessel or any other tangible or intangible property of Cruise Line for purposes of obtaining security or jurisdiction with respect to any such claim.

### Section 25.6. *Assignment.*

#### Subsection 25.6.1   *By Purchaser.*

Purchaser shall not assign any of its rights under this Agreement without the prior written consent of Cruise Line. Purchaser shall not delegate any of its obligations under this Agreement without the prior written consent of the other party. No delegation shall relieve the Purchaser of any of its obligations under this Agreement. Assignments and delegations prohibited by this Subsection 25.6.1 include, without limitation:

a. the voluntary transfer of rights.

b. the transfer of rights by operation of law.

c. the transfer of rights by consolidation or merger (whether or not such party is the surviving corporation).

d. the assignment of a right to money damages arising out of a party's breach of the entire Agreement or a party's full performance of the Agreement.

Any purported assignment or delegation in violation of this Subsection 25.6.1 is void.

#### Subsection 25.6.2   *By Cruise Line.*

Cruise Line may assign, convey or transfer its rights or obligations under this Agreement: (a) at its discretion, to any parent, subsidiary or affiliate of Cruise Line; or (b) or to anyone else with the prior written consent of Purchaser, which consent shall not be unreasonably withheld.

### Section 25.7. *Remedies.*

The remedies of each party hereto under this Agreement shall be cumulative of each other and of the remedies available at law or in equity. Any party's full or partial exercise of any such remedy shall not preclude any subsequent exercise by such party of the same or any other remedy.

### Section 25.8. *No Partnership or Joint Venture.*

The Parties expressly agree, as a material part of this Agreement, that this Agreement does not, in any way, create a partnership or joint venture relationship between Cruise Line and Purchaser. Neither Party will be deemed to be an agent or representative of the other Party and neither Party may create any obligations or responsibilities on behalf of or in the name of the other. Under no circumstances may Purchaser hold itself

MUST BE STAMPED BY RCL LEGAL AND SIGNED BY A SVP OF RCL TO BE BINDING
PROPRIETARY AND CONFIDENTIAL

PURCHASER
Please Initial

27

out to be a partner, employee, franchisee, representative, servant, or agent of Cruise Line. Any breach of the foregoing prohibitions shall constitute a material breach of this Agreement.

### Section 25.9. *Captions.*

The captions contained in this Agreement are for convenience of reference only and shall not affect in any way the meaning, construction or scope of this Agreement.

### Section 25.10. *Counterparts.*

This Agreement may be executed in one or more counterparts, each of which is an original, and all of which together constitute only one agreement between the parties. The signatures of all the parties do not need to be on the same counterpart for it to be effective.

Delivery of an executed counterpart of this Agreement, by facsimile or electronic mail in portable document format (.pdf) has the same effect as delivery of an executed original of this Agreement. Notwithstanding the preceding sentence, each party hereto shall deliver original counterparts to the other parties by no later than fifteen (15) days after delivering the counterpart by facsimile, e-mail or any means other than delivering the original permitted by the preceding sentence.

### Section 25.11. *Entire Agreements.*

This Agreement, including the following exhibits and schedules hereto, constitutes the complete and exclusive statement of the terms and conditions of the agreement relating to the subject matter hereof and supersedes all prior negotiations, understandings and agreements, whether written or oral, between the parties.

| | |
|---|---|
| Exhibit A: | Amenities |
| Exhibit B: | Individual Guest Cruise Ticket Contract |
| Exhibit C-1: | Pre-Approved Confirming Banks |
| Exhibit C-2: | Sample Form of Standby Letter of Credit |

### Section 25.12. *Amendments.*

This Agreement may be altered, modified, amended or changed only by an instrument in writing executed by all parties. No waiver by any party of any breach of the covenants set forth herein, or any rights or remedies provided hereunder, shall be deemed a waiver of the same or any other breach, right or remedy, unless such waiver is in writing and is signed by the party sought to be bound. The failure of a party to exercise any right or remedy shall not be deemed a waiver of such right or remedy in the future.

### Section 25.13. *Business Days.*

If any date on which a party is required to make a payment or a delivery pursuant to the terms hereof is not a Business Day, then such party shall make such payment or delivery on the next succeeding Business Day. As

MUST BE STAMPED BY RCL LEGAL AND SIGNED BY A SVP OF RCL TO BE BINDING
PROPRIETARY AND CONFIDENTIAL

PURCHASER
Please Initial

28

used herein, the term Business Day" means, a day other than a Saturday, Sunday or other day on which commercial banks in Miami, Florida are authorized or required by law to close.

### Section 25.14. *Interpretation.*

For purposes of this Agreement, (a) the words "include," "includes" and "including" are deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. Unless the context otherwise requires, references herein: (x) to sections, schedules and exhibits mean the sections of, and schedules and exhibits attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof; and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The schedules and exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

### Section 25.15. *Severability.*

If any provision of this Agreement is held invalid or unenforceable, then such provision shall be modified automatically to the extent necessary to make such provision fully legal, valid or enforceable.

## ARTICLE 26.    CONTINGENCY

**THE TERMS AND CONDITIONS SET FORTH HEREIN SHALL NOT BECOME LEGALLY BINDING UPON CRUISE LINE UNLESS AND UNTIL ALL OF THE FOLLOWING CONDITIONS HAVE BEEN FULLY SATISFIED:**

    **A.**    **THIS AGREEMENT IS EXECUTED BY THE PURCHASER AND RETURNED TO CRUISE LINE, ALONG WITH THE LETTER OF CREDIT REQUIRED BY ARTICLE 9, ON OR BEFORE APRIL 20 2018; AND**

    **B.**    **PURCHASER HAS PAID TO CRUISE LINE AND CRUISE LINE HAS RECEIVED IN READILY AVAILABLE FUNDS IN THE CURRENCY PROVIDED FOR BY THIS AGREEMENT THE INITIAL DEPOSIT AMOUNT SPECIFIED IN SECTION 8.1 ON OR BEFORE  APRIL 20, 2018;**

    **C.**    **CRUISE LINE HAS EXECUTED, BY AN AUTHORIZED OFFICER OF CRUISE LINE, THE SIGNED OFFER RECEIVED FROM PURCHASER PURSUANT TO PARAGRAPH A OF THIS ARTICLE 26.**

[AGREEMENT CONTINUED ON NEXT PAGE]

MUST BE STAMPED BY RCL LEGAL AND SIGNED BY A SVP OF RCL TO BE BINDING<br>PROPRIETARY AND CONFIDENTIAL

PURCHASER
Please Initial

Royal Caribbean Resale: Ver. 2017.10

IN WITNESS WHEREOF, the parties hereto have caused this agreement to be executed the day and year as indicated thereto.

**ROYAL CARIBBEAN CRUISES LTD.**      **CRUISE PARTNERS LLC.**
d/b/a Royal Caribbean International

By:_____          By:_____

Name:_____          Name: *Patrick E. Belardi*

Title:_____         Title: *Principal*

Dated:_____          Dated: *4/19/18*

MUST BE STAMPED BY RCL LEGAL AND SIGNED BY A SVP OF RCL TO BE BINDING
PROPRIETARY AND CONFIDENTIAL

PURCHASER
Please Initial

30

**EXHIBIT B**

DocuSign Envelope ID: 3696DFAD-1203-4E0E-8CE8-63C195BD1792

### AMENDMENT No. 1
## TO THE ROYAL CARRIBBEAN INTERNATIONAL GUEST ACCOMMODATIONS PURCHASE AGREEMENT

This document, effective January 17, 2019, is Amendment No.1 (the "Amendment") to the Guest Accommodations Purchase and Resale Agreement (the "Agreement"), bearing an Issue Date of April 19, 2018 entered into between *ROYAL CARIBBEAN CRUISES LTD., a* Liberian corporation d/b/a Royal Caribbean International located at 1050 Caribbean Way, Miami, FL 33132 ("Cruise Line") and *CRUISE PARTNERS LLC.,* a limited liability company organized under the laws of the state of Pennsylvania located at *317 Davis Street, Clarks Summit, PA 18411* ("Purchaser"). Capitalized terms not defined herein shall have the meaning set forth in the Agreement.

### RECITALS

*WHEREAS,* Purchaser acknowledged that it will be unable to fill all of the accommodations of the Vessel as it had contracted to do under the Agreement;

*WHEREAS,* by letter agreement dated November 29, 2018, Purchaser allowed Cruise Line to take back and offer for sale a certain number of cabins for the Cruise under the condition that Purchaser remain fully responsible for its obligations under the Agreement; and

*WHEREAS,* even though Cruise Line continues to expressly reserve all rights under the Agreement, including without limitation, its rights to draw on the Letter of Credit thereunder to satisfy any shortfalls from the Cruise Fare, Guaranteed Gratuity Amount, the Guaranteed Net Onboard Revenue, and any other amounts or fees due from Purchaser, Cruise Line is willing in good faith to help Purchaser mitigate its financial obligations to offer for resale to the public cabins on the Cruise, subject to the terms and conditions of the Agreement as modified by this Amendment.

*NOW, THEREFORE,* for good and valuable consideration, the sufficiency of which is hereby acknowledged by the Parties, and the covenants and agreements herein contained, the Parties agree as follows:

1.    The above recitals are incorporated by referenced herein and shall be a part of this Amendment and the Agreement.

2.    The Agreement is hereby modified as specified below.

- Pursuant to the process set forth in the Agreement, subsequent to the Cruise there will be a reconciliation process for all financial items pertaining to the sailing, including, but not limited to, Cruise Fare and Net Onboard Revenue. Cruise Line may draw on the Letter of Credit to cover any shortfalls that Purchaser is unable to provide.
- Purchaser shall provide, concurrently with the execution of this Amendment, a manifest of the 113 stateroom categories sold by Purchaser to date, including stateroom numbers and guest names and addresses.
- Purchaser shall provide, concurrently with the execution of this Amendment, the list of staterooms the Purchaser will release back for Cruise Line to sell in FIT.
- Purchaser shall provide, concurrently with the execution of this Amendment, a list of the staterooms Purchaser needs for staff, athletes and its associates that is not part of the 113 staterooms manifest.

1

DocuSign Envelope ID: 3696DFAD-1203-4E0E-8CE8-63C195BD1792

- Subject to Cruise Line's prior review and written approval, Purchaser shall prepare a communication letter to be sent to the 113 staterooms sold by Purchaser to date, advising such guests that the Cruise is no longer a full ship charter and that it is a group with Penn State events and RCI guests. For avoidance of doubt, Purchaser's communication must be in the form and content approved by Cruise Line.

3. Except as expressly modified herein, each and every term of the Agreement shall remain in full force and effect. The Irrevocable Letter of Credit No. 1674 issued by FNCB Bank for Cruise Line as the sole beneficiary (the "Letter of Credit") also remains in full force and effect. Cruise Line expressly reserves any and all rights under the Agreement and the Letter of Credit.

4. Each party warrants and represents that:

    a. It is duly organized, validly existing and in good standing.
    b. It has all necessary power and authority to execute and deliver this Amendment, and to perform its obligations under this Amendment.
    c. This Amendment constitutes a valid, legal and binding obligation, enforceable against it, in accordance with its terms.
    d. The execution, delivery and performance of this Amendment will not constitute a violation of any law, rule, regulation or court order applicable to it.
    e. It has no commitment, express or implied, with any other person, firm or corporation that is in conflict with the terms, conditions and understandings contained in this Amendment.
    f. It has the full and unrestricted right to grant to the other all of the rights granted under this Amendment.

5. Purchaser recognizes that time is of the essence. This Amendment shall be executed by Purchaser and returned to Cruise Line by 5:00 pm EST on Tuesday, January 22, 2019, or it shall be null and void, at which such time Cruise Line may elect to exercise its rights and remedies under the Agreement, including without limitation declaring the Agreement in Default and drawing on the Letter of Credit.

6. Counterparts. This Amendment may be signed in counterparts. Faxed or emailed signatures shall have the same force and effect as originals.

2

DocuSign Envelope ID: 3696DFAD-1203-4E0E-8CE8-63C195BD1792

*IN WITNESS WHEREOF,* the Parties have executed this Amendment on the dates set forth below.

*ROYAL CARIBBEAN CRUISES LTD.*
d/b/a Royal Caribbean International

By: _Vicki Freed_
    ━━━━━━━━━━━━
    DocuSigned by:
    C34B06177367486...

Name: Vicki L. Freed

Title: Senior Vice President of Sales & Trade
Support & Services

Dated: 1/22/2019
_____

*CRUISE PARTNERS LLC.*

By: _James RV Verano_
    _____

Name: _JAMES R. VERANO_

Title: _PARTNER_

Dated: _1/22/19_
_____



3